## *Ex parte* MORRILL.

*(Circuit Court, D. Oregon.   June 18, 1888.)*

UNITED STATES MARSHALS—SPECIAL DEPUTIES—DUTIES AT ELECTIONS—WRONGFUL ARREST—PROBABLE CAUSE.

A special deputy-marshal of the United States in the course of his duty made an arrest under section 2022 of the Revised Statutes, at an election for a representative in congress, and took the party before a United States commissioner, where he was charged with aiding and counseling a person to vote at such election who had no legal right to vote, and discharged on bail, and immediately made a complaint against said deputy before a police judge, accusing him of the crime of assault and battery, by assaulting and beating the complainant, on which a warrant of arrest was issued, and he was taken and lodged in the county jail. Thereupon, on the petition of the deputy, a writ of *habeas corpus* was allowed by the district judge, returnable into the circuit court, then in session; and from the return to the writ it appeared that the process under which the jailer claimed to hold the deputy was the said warrant of arrest. On the hearing the court found that the deputy had probable cause, at the time of the arrest of the party, to believe that he had committed the crime of aiding and counseling a person to vote at such election, who had no right to vote thereat, and that the alleged assault and battery with which the deputy was charged consisted simply in the arrest of the complainant, without force or violence, for the crime aforesaid. *Held* (1) That a special deputy-marshal, appointed under section 2021 of the Revised Statutes to keep the peace and preserve order at the polls at an election for representative in congress, is, as to such election, and the crimes for which, under section 2022 of the Revised Statutes, he may make arrests, without process, a peace-officer; (2) that a crime is committed "in the presence" of such deputy, within the provisions of said section 2022, when the facts within his observation, in connection with what, under the circumstances, may be considered common knowledge, give him probable cause to believe, or reasonable ground to suspect, that such is the case; and (3) probable cause or reasonable ground to suspect is such a state of facts as will constitute a defense to an action for false imprisonment or malicious prosecution, and it is sufficient if the facts or appearances are sufficient to induce a reasonable probability that all the acts which constitute the crime have been done.

*(Syllabus by the Court.)*

*Habeas Corpus.*
*Lewis L. McArthur*, for petitioner.
*Alfred F. Sears, Jr.*, for respondent.

ₗ. DEADY, J.   On June 4, 1888, the petitioner, Eli Morrill, was arrested by a police officer of this city, and lodged in the county jail on a charge of assault and battery.

He immediately applied by petition to the United States district judge for a writ of *habeas corpus*, alleging in his petition that he was a deputy United States marshal for the district of Oregon; that in the discharge of his duty as such deputy he was about to arrest a person for aiding and abetting an illegal voter in casting a vote for a representative in congress, at polling place 3, in South Portland precinct, at an election for such representative then and there being held, when he was arrested by Samuel Parrish without authority of law, and delivered to the custody of the sheriff of Multnomah county and his jailer.   The writ was allowed, and made returnable forthwith in the United States circuit court, then in session.

The respondent, H. C. Wood, the jailer of Multnomah county, immediately produced the body of the petitioner in court, with the original warrant on which the arrest was made, when by consent of parties the respondent had until June the 7th to make a formal return to the writ, and the petitioner until the following day to reply thereto, when the cause should be heard; whereupon an order was made admitting the petitioner to bail in the sum of $500.

On June the 8th the parties appeared, and witnesses were sworn and testified for and against the petitioner on the question of the alleged assault and battery, and the alleged grounds of the arrest by the petitioner of Walter F. Matthews, for aiding and counseling a person to vote at said election who had no legal right to vote.

From the admissions in the pleadings and the evidence I find the following facts:

The petitioner, Eli Morrill, on June 4, 1888, was a duly-appointed and qualified special deputy-marshal of the United States for the city of Portland, Or., a city of more than 20,000 inhabitants, under section 2021 of the Revised Statutes, and was authorized to perform the duties and exercise the powers of such deputy at an election for representative in congress then being held in said city; that about 10 o'clock of said day the petitioner, having good reason to believe, from his observation and knowledge, that one Matthew or Mace Cetel or Tetel had voted illegally at said election at polling place 4 in South Portland precinct, the fact being, as it now appears, that said Cetel is an unnaturalized alien who had not even declared his intention to become a citizen of the United States, arrested him therefor without a warrant, and took him before a United States commissioner in the United States court-rooms, in said city, and there made a complaint against him to that effect; that soon after the arrest of Cetel the petitioner, having good reason to believe, from his observation and knowledge, that J. L. Carrol and Walter F. Matthews did aid and counsel said Cetel to so vote illegally, arrested them therefor, the latter being arrested in the hall outside of the door of the marshal's office, whither he had gone to go bail for Carrol, by the petitioner placing his hand on his shoulder, without violence or rudeness, and telling

him he was under arrest, and asking him to walk into the office, where he remained until he gave bail; that soon after Matthews was discharged he went before the police judge of the city, having the jurisdiction of a justice of the peace, and made a complaint under oath, accusing the petitioner of the "crime of assault and battery," committed as follows: "The said Eli Morrill, on the 4th day of June, 1888, in the city of Portland, * * * did willfully and unlawfully assault and beat" said Matthews; the fact being that the petitioner did not "beat" said Matthews, or lay his hand on him, otherwise than as above stated; that on this information said judge issued a warrant for the arrest of the petitioner for the crime of assault and battery, returnable before himself forthwith, on which is an indorsement to the effect that the same was received on June 4, 1888, and executed by arresting Morrill on the same day; signed, "S. B. PARRISH, Chief of Police of the city of Portland, by S. S. YOUNG, Police Officer;" that said police officer, instead of taking the petitioner before said judge for examination and discharge on bail, or commitment, as required by law and by said warrant commanded, lodged him in the county jail with the warrant, without examination or commitment, where he remained until taken out on the writ of *habeas corpus*.

From the improper conduct of the officer intrusted with the execution of this warrant, taken in connection with the exaggeration and falsehood contained in the information on which it was issued, it is quite evident that the real purpose of the proceeding was to lock up this special deputy, and thus prevent him from performing his duty in guarding the polls against fraudulent votes and practices.

The only question of fact about which there is any substantial conflict of testimony is the part which Walter F. Matthews took in getting Cetel's illegal vote into the ballot-box. On the witness stand he admits that he was engaged on the day of the election at said polling place 3 as a "worker" for one of the political parties, but denies that he took any part in getting Cetel to vote.

It appears that Cetel went first to polling place 3, and offered to vote, and, on being questioned by the judges, he was found to be an unnaturalized foreigner, who had not even declared his intention to become a citizen, and his vote was rejected. Morrill, who was standing within plain view of the polling place, and saw Cetel, thought he voted there. From this polling place Cetel went directly to the corner of Fourth and Mill streets, near by where it is admitted Fred D. Matthews, the brother of Walter F. Matthews, and J. L. Carrol were standing. Fred Matthews and Carrol were also engaged at that polling place as "workers" for the same party as Walter F. Matthews.

Fred D. Matthews admitted on the witness stand that he, knowing Cetel had just been rejected by the judges at polling place No. 3, asked Carrol to "go with him to another polling place, and see if he couldn't get him to vote,"—that is, get his vote in the ballot-box. Carrol made some question as to how he was to get Cetel to a polling place, when Matthews told him to call an express wagon in the service of their party, which stood near by, which he did, when Matthews and Carrol

got Cetel in the wagon and Carrol drove off with him, to find a voting place. This is the substance of Fred D. Matthews' story,. and Carrol's is to the same effect, except that he says Fred D. Matthews came to him on the occasion, and said: "Here is a man,· [Cetel;] take him to polling place 4, and see if you can vote him," which he did, and voted him.

Both of these witnesses seek to make the impression that Walter F. Matthews, although at that poll, had nothing to do with the transaction. The statements in this respect are generally vague, and sometimes evasive. The most direct are these: Fred D. says, "Did not see my brother when man [Cetel] put in wagon;" and Carrol says, Walter F. "had nothing to do with Cetel." True, Fred D. might not have been looking at Walter F. at this moment, and yet the latter may have participated in the con-.sultation and shared in the conclusion that Carrol should take Cetel to polling place 4 and vote him, and then turned away to look after some other Cetel. And it may be true, so far as Carrol saw, that Walter F. had nothing to do with Cetel personally, and yet he may have consulted and advised with his brother concerning his being sent to polling place 4 with Carrol, for, according to his own statement, his attention was not attracted to this matter until Fred D. came to him and said, "Here is a man, take him to polling place 4, and see if you can vote him."

·When Cetel left the window of polling place 3 and went to the Matthews', Morrill testifies that R. G. Church called his attention to the party, and warned him of them. Church testifies that about that time of day he saw suspicious characters about the place indicated—the corner of Fourth and Mill streets—in company with "the Matthews boys," and that he called Morrill's attention to them, and said, "the Matthews boys are using influence to get suspicious characters to vote." Morrill swears that he then gave the party his attention, and saw both the Matthews and Carrol talking to Cetel in an urgent manner, when Carrol and Walter F. Matthews got into the wagon with Cetel and started off. Thereupon he got in a hack and told the driver to follow the wagon, which he did, to polling place 4; and by the time he got out of the hack and up to the place Cetel had voted. On being assured of this fact by the judges, he arrested him, and took him back to polling place 3, when the judges and supervisors identified him as the alien who had just before offered to vote there and was refused. The weight of the testimony of the two Matthews and Carrol is affected by their part in and relation to this transaction; though it must be admitted that Fred F. Matthews appears to have spoken very candidly concerning his own part in it. He admits that he sent Carrol with Cetel to polling place 4, to get his vote in if he could, when he knew that the same had just been refused by the judges at polling place 3 on the ground of his being an alien who had not declared his intentions, which fact must have been strongly corroborated, if not suggested by his imperfect English.

But the testimony of Walter F. is also unfavorably affected by the fact that he made oath to the complaint on which this warrant issued, wherein he positively and explicitly stated that Morrill not only assaulted him, but "beat" him, when he was forced to admit on the witness stand that

he was neither "struck," nor "bruised," nor "hurt," and that the alleged "assault and battery" consisted simply in an arrest, wherein, at most, he now only claims that he was caught by the arm and "rudely" pushed into the marshal's office, and "unceremoniously" set down in a chair; and even that is a gross exaggeration of the fact, as appears from the testimony of a third person then present.

But it must be admitted that Morrill's testimony on this point is not as satisfactory as it ought to be. When on the stand he admitted that he did not readily or certainly know the Matthews boys apart, though they bear no resemblance to one another. But he was excited and confused, and may have, and probably did, mean that he could not distinguish them by their names; did not know which was Fred and which was Walter, or, as he is commonly called, "Jack." They were both in the court-room, and he undertook to point out the one he saw working with Cetel at the corner of Fourth and Mill, but the men were nearly in a line, and I did not get a clear idea of which one he meant. On the argument it was claimed by counsel for the respondent that he pointed out Fred D., and, this being disputed by counsel for the petitioner, and I being unable to say whether he did or not, Morrill was recalled, when he pointed to Walter F., and said positively he was the man. But then he had heard the discussion, and was apprised of the importance of the matter. If, under the circumstances, Walter F. was entitled, as a witness, to full credit, I should say that Morrill, after arresting Cetel and Carrol, and bringing them to the marshal's office, as he went out met Walter F. in the hall, where he had come from polling place 3 to go bail for Carrol, and knowing that he was a Matthews, he mistook him for his brother, whom he had seen working with Cetel, and arrested him; and as it is, I can but say that possibly this may be the true version of the affair.

And this shows how necessary it is in the administration of these laws to select level-headed, intelligent persons of good standing in the community for the office of supervisor and deputy-marshal, so that when any question arises in the courts or elsewhere as to what took place or what was done at a given polling place, they may be relied on for an intelligent and truthful account of the matter.

The portions of the Revised Statutes under which the petitioner was appointed and acting as special deputy-marshal when he arrested Walter F. Matthews, are taken from the act of May 31, 1870, (16 St. 140,) entitled "An act to enforce the right of citizens of the United States to vote in the several states of this Union, and for other purposes;" and from the act of February 28, 1871, (16 St. 433,) amendatory thereof. They relate to the election of representatives in congress, and are passed in pursuance of the power granted to congress in section 4 of article 1 of the constitution of the United States, which reads:

"The times, places, and manner of holding elections for senators and representatives shall be prescribed in each state by the legislature thereof; but the congress may at any time by law make or alter such regulations except as to the place of choosing senators."

The constitutionality of this legislation, if there ever was any reasonable doubt about it, has long since been firmly established by the supreme court. *Ex parte Siebold*, 100 U. S. 391; *Ex parte Yarbrough*, 110 U. S. 651, 4 Sup. Ct. Rep. 152.

In these cases it was held that while the constitution of the United States (article 1, § 2) adopts the qualification prescribed by the state for a voter for the popular branch of its own legislature as the qualification for a voter for a representative in congress, yet the right of the latter to vote is based on the constitution, and not on the state law; and congress has a supervisory power over the subject, and in the exercise thereof, to secure legal and fair elections, a free, pure, and safe exercise of the right to vote thereat; and to prevent fraud and violence thereabout may (1) either make altogether new regulations or add to or alter those already prescribed by the state; (2) impose new duties on the state officers of election, and provide for the appointment of other officers thereof; and (3) compel the observance of state and national laws regulating such elections by punishing any violation thereof. All state regulations, so long as congress does not displace or alter them, are in effect congressional regulations; but a regulation made by congress is of paramount authority, and makes void and of no effect any state law which is repugnant to it.

Section 2021 of the Revised Statutes requires the marshal, whenever any election at which a representative in congress is to be chosen, upon application by two citizens of a town of more than 20,000 inhabitants, to appoint special deputy-marshals, whose duty it shall be to aid and assist the supervisors of election in the discharge of their duties.

Section 2022 requires the marshal and his deputies to "keep the peace," and protect the supervisors in the discharge of their duties; to preserve order at the polls; to prevent fraudulent voting, and fraudulent conduct on the part of any officer of election, and immediately to arrest, with or without process, any person who commits or attempts to commit any offense against the United States; "but no person shall be arrested without process for any offense not committed in the presence of the marshal or his general or special deputies, or either of them, or of the supervisors of election, or either of them."

Section 5511 declares, among other things, that if at any election for a representative in congress any person knowingly votes without having a lawful right to vote, or if any person shall "aid, counsel, procure, or advise" another to so vote, he shall be punished by a fine of not more than $500, or by imprisonment not more than three years, or by both, and shall pay the costs of the prosecution.

When is an offense "committed in the presence" of a marshal, within the meaning of section 2022?

In answering this question consideration must be given to the fourth amendment to the constitution:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affir-

mation, and particularly describing the place to be searched, and the persons or things to be seized."

It has never been understood that this provision was intended to or does prevent an arrest by a peace-officer—a sheriff or constable—for a crime committed in his presence. Whart. Crim. Pl. § 8; 1 Bish. Crim. Proc. § 181. The knowledge derived by the officer from his observation, acting under the sanction of his official oath, is considered equivalent to information supported by the oath or affirmation of another.

Now, a warrant of arrest may issue on "probable cause" supported by oath; and by analogy a peace-officer may arrest on probable cause derived from his own observation. At common law a peace-officer might arrest without warrant "on reasonable grounds of suspicion;" and the facts and circumstances which furnish such grounds of suspicion amount to "probable cause," under the constitution, which is such cause as will constitute a defense to an action for false imprisonment or malicious prosecution. Whart. Crim. Pl. § 9; 1 Bish. Crim. Proc. 182; Rap. & L. Law Dict. "False Imprisonment," "Malicious Prosecution." Probable cause is a probability that the crime has been committed by the person charged. The facts stated upon oath "must induce a reasonable probability that all the acts have been done which constitute the offense charged." Cranch, C. J., in U. S. v. Bollman, 1 Cranch, C. C. 379; Wheeler v. Nesbitt, 24 How. 551.

In other words, a crime is committed in the presence of the officer when the facts and circumstances occurring within his observation, in connection with what, under the circumstances, may be considered as common knowledge, give him probable cause to believe, or reasonable ground to suspect, that such is the case. It is not necessary, therefore, that the officer should be an eye or an ear witness of every fact and circumstance involved in the charge, or necessary to the commission of the crime.

A special deputy-marshal appointed under said section 2021 is, in my judgment, a peace-officer touching an election for representative in congress, and in respect to any crime for which he is authorized to make an arrest by said section 2022. He is specially charged by the statute to "keep the peace" and "preserve order" at the polls during such elections, and to make arrests without process thereat, for crimes committed in his presence; and in my judgment a crime is so committed when the facts and circumstances within his knowledge and observation give him probable cause to believe that a crime has been committed.

This being the case, there is no doubt, on the facts found, that the petitioner had probable cause to believe that Walter F. Matthews had, at the time of his arrest, committed the crime of aiding, counseling, procuring, and advising a person to vote, who had no legal right to vote. He saw Cetel vote, or offer to vote, at polling place 3, and saw him soon after vote at polling place 4, in which he was confirmed by the judges, in presence of the illegal voter. He then heard from the judges at polling place 3, in the presence of Cetel, and without dissent, that his vote had just been rejected at that poll on the ground that it appeared from his own examination that he was not a qualified voter. He saw Mat-

thews, a confessed party "worker," at this polling place, take Cetel soon after in a party express wagon, and vote him at polling place 4, under circumstances that warranted the belief that he knew, as he ought to have known, that Cetel was not a legal voter.

As the world goes, one man may persuade another to cast a vote for or against a particular person or party; but law and good morals require that he should first know or have good reason to believe that the person persuaded is a qualified voter. He acts at his peril. The pollution of the ballot box with illegal votes is one of the gravest crimes that can be committed against society. For the most part, money is the means by which this result is accomplished; and if political parties may subsidize unscrupulous "workers" to engage in this nefarious business with impunity, the day will come when we may expect the republic to be put up at auction, and knocked down to the highest bidder.

To prevent such a result, and preserve the purity and integrity of elections for members of the house of representatives, the acts of 1870 and 1871 were passed by congress, and, if faithfully enforced, as provided, through the agency of competent and trustworthy supervisors and marshals, aided by an honest and patriotic public sentiment, much good will be accomplished and evil prevented.

As was well said by Mr. Justice MILLER, in speaking for the court, in *Ex parte Yarbrough*, 110 U. S. 666, 4 Sup. Ct. Rep. 152:

"It is as essential to the successful working of this government, that the great organisms of its executive and legislative branches should be the free choice of the people, as that the original form of it should be so. * * * In a republican government, like ours, where political power is reposed in representatives of the entire body of the people, chosen at short intervals by popular elections, the temptation to control these elections by violence and corruption is a constant source of danger. Such has been the history of all republics, and, though ours has been comparatively free from both these evils in the past, no lover of his country can shut his eyes to the fear of future danger from both sources."

It follows from these premises that the crime of assault and battery was not committed by the petitioner on Walter F. Matthews, as alleged in the latter's complaint, and stated in the warrant on which the former was arrested; and that the alleged assault and battery was nothing more than the lawful arrest of Matthews by the petitioner on probable cause to believe that a crime had been committed by the former against the United States, and therefore the petitioner is illegally restrained of his liberty, and entitled to be discharged.

But in my judgment the respondent is not authorized to restrain the petitioner of his liberty, even if the latter acted without probable cause in making the arrest of Matthews. The process under which the respondent professes to hold him is not directed to the sheriff or jailer of Multnomah county. Indeed, it is not a commitment at all. The warrant only authorized the officer executing it to bring the petitioner before the officer issuing it for examination, when he would be entitled to be discharged, held to bail, or, in default thereof, committed to prison. The police officer, Young, had no authority to deliver the petitioner to the

keeper of the county jail, nor such keeper to receive or hold him. His detention by the respondent is, therefore, it seems to me, illegal in any view of the matter.